David B. Oliver v. James L. Sanborn, Lee R. Sanborn, William H. Sanborn, Arthur T. Smith, and Isaac L. Lyon.

*Bona fide purchaser—Notice of unrecorded deed—Duty of purchaser defined —Willful ignorance equivalent to possession of the knowledge he avoids— Charged with notice of facts definitely communicated to him—And which a proper use of such information would have enabled him to ascertain— Bankruptcy proceedings — Adjudication and assignment vest debtor's property in his assignees—Title not reinvested by his subsequent discharge —Remains in assignees until their discharge—Answer of jury to special question—When not binding in appellate court.*

1. Upon the undisputed testimony in this case, as recited in the opinion, *Held*, as a matter of law, that plaintiff was chargeable with notice of the prior unrecorded deed through which defendants claim title to the lumber replevied.

2. Notice to a proposed purchaser of lands, from one claiming title to the timber thereon through a purchase from the holder of an unrecorded deed, of the claim of his vendor to such lands, is sufficient to put a prudent man upon inquiry as to the fact of such alleged ownership.

3. A deed, executed out of the State of Michigan, was received for record and recorded August 2, 1882, but the certificate required by the statute to entitle it to record was dated August 12, 1882. The question is suggested, but not decided, whether, if the date of the certificate is correct, and it was attached to the deed after it was recorded, the whole deed should not have been re-recorded in order to protect the purchaser and cut off a prior unrecorded deed.

4. Where, as in the case at bar, a plaintiff invokes the aid of the statute protecting innocent purchasers in good faith and without notice, in aid of an attack upon the possession and rights of others, and not as a shield to protect an acquired possession, it rests with him to disprove every fact and circumstance put in evidence by the defendant, from which notice may legitimately be inferred, or which justifies the inference that it was his duty to inquire as to alleged adverse ownership. He is chargeable with notice, not only where the evidence raises a presumption that he knew, but where there is just ground for inferring that reasonable diligence would have led him to a discovery of the truth. *Warren v. Swett,* 31 N. H. 332; *Nute v. Nute,* 41 Id. 60.

5. " One who willfully remains ignorant where the rights of third persons are concerned, is as much in default as if possessed of the knowledge which he avoids; and a purchaser has notice, not only of what is definitely communicated to him, but of all that a proper use of that information would have enabled him to ascertain." See 2 Leading Cases in Eq. (White & Tudor) 4th Am. Ed., pt. 1, pp. 153-4, and cases there cited; *Baker v. Bliss*, 39 N. Y. 70; *Converse v. Blumrich*, 14 Mich. 120 ; *Stetson v. Cook*, 39 Mich. 754; *Hosley v. Holmes*, 27 Mich. 427.

6. A debtor was adjudicated a bankrupt, and the usual assignment executed to his assignees by the register in bankruptcy. After his discharge, but before that of his assignees, he conveyed by quit-claim deed to the plaintiff a tract of land formerly owned by him, the record title to which appeared in his name, stating to his grantee that the lands were not inventoried in the bankruptcy proceedings; but plaintiff made no further inquiry on the subject. In a suit brought by plaintiff involving the title to said lands, it appeared that some three years prior to the bankruptcy proceedings the bankrupt had deeded the same lands to another party, through whom the defendants in the case claimed title to the timber cut therefrom.

   *Held*, that plaintiff was not an innocent purchaser; that if his grantor had any interest in the lands, it passed to and still remained in his assignees in bankruptcy, and that he had absolutely nothing to convey to plaintiff, who must be held to have had notice, because he was apprised by his grantor of the bankruptcy proceedings before his purchase.

   *Held*, further, that the fact that his grantor had received his discharge did not operate to reinvest him with the property transferred to his assignees.

7. Where the jury, in answer to a special question, found that a plaintiff acted in good faith in the purchase of land, but it appears from the record that they did not apply the proper *legal* standard to test the good faith of the purchase under the facts and circumstances of the case, such finding is not conclusive in the appellate court.

Error to Alpena. (Emerick, J.) Argued February 11, 1886. Decided April 8, 1886.

Replevin. Defendants bring error. Reversed. The facts are stated in the opinion.

*George H. Sleator*, for appellants:

Inquiry must be made where information is likely to be obtained: *Hosley v. Holmes*, 27 Mich. 427 ; *Shotwell v. Harrison*, 30 Mich. 179.

Plaintiff's grantor having been adjudged a bankrupt prior to the time he made his purchase, and the property described in his quit-claim deed having passed, by virtue of the bankruptcy proceedings, to the assignees, he acquired no title thereby, and cannot maintain this action. It was necessary for plaintiff to show a right to the *possession* of the property in question at the time of the commencement of his action: Wells on Replevin, § 107; *Belden v. Laing*, 8 Mich. 502; and it was proper for defendants to show that that right was in a third person. Plaintiff, as against the assignees, had no title whatever. If some third party was the owner of the land, defendants would have a right, upon familiar principles, to show that fact and defeat plaintiff's action. If title to the land in question was in the assignees, plaintiff was a mere stranger, and had no right to interfere with defendants' possession.

"A person who purchases from the bankrupt after the commencement of the proceedings takes no title although he has no notice thereof. The question of notice cannot arise": *Stuart v. Hines et al.*, 33 Iowa, 60; the assignment "vests the property in the assignee although it is not placed on the bankrupt's schedule:" *Holbrook v. Coney*, 25 Ill. 543; *Jewett v. Preston*, 27 Me. 400.

"It was not necessary that Oliver should have had actual knowledge that defendants owned the timber; if he had knowledge of such facts and circumstances as would put a prudent man upon inquiry, he is chargeable with notice of such facts as the inquiry would have disclosed." This request should have been given. It embodies, we think, the settled law of the State upon this point: *Wilcox v. Hill*, 11 Mich. 256; *Converse v. Blumrich*, 14 Mich. 120; *Boxheimer v. Gunn*, 24 Mich. 372; *Stetson v. Cook*, 39 Mich. 750; *Mich. Mu. Ins. Co. v. Conant*, 40 Mich. 530, 536. The above are all cases in equity; but there is no difference between a purchaser in good faith under the registry laws, and a bona fide purchaser within equity decisions in other cases: *Thomas v. Graham*, Walk. Ch. 118; *Shotwell v. Harrison*, 22 Mich. 410.

*Turnbull & Dafoe*, for plaintiff:

Defendants were not creditors of Johnston, hence strangers to the bankruptcy proceedings and to the deed to plaintiff; and they cannot attack it as in fraud of such creditors or of the assignees: *Crane v. Reeder*, 25 Mich. 304; *Voorhies v. Frisbie*, 25 Mich. 476; *Bromley v. Goodrich*, 40 Wis. 131.

If the deed was in fraud of such proceedings, the assignee, as representative of such creditors, is the proper person to take proceedings in their behalf to set it aside and bring the land into the bankruptcy tribunal for distribution; *McMaster v. Merrick*, 41 Mich. 512. No such action seems to have been taken, and the case is clearly within the principle of *Wisner v. Brown*, 50 Mich. 553.

Land not disposed of by such assignee belongs to the bankrupt or his heirs, although he did not schedule it: *Jones v. Pyron*, 57 Texas, 43; and where a debtor's land is levied upon by an execution from a state court, and he is afterwards adjudged a bankrupt, but no proceedings taken in the bankrupt court to distribute such land, the sheriff is not excused for not proceeding on his writ: *Urquhart v. Leverett*, 69 Ga. 92.

Was plaintiff an innocent purchaser from Johnston? How. Stat. § 5683, declares all unrecorded deeds of real estate void as against subsequent purchasers in good faith, for a valuable consideration. Both these elements are required to exist: *Shotwell v. Harrison*, 22 Mich. 409.

There being evidence to support the special finding of the jury, it is conclusive: Id; *Tillman v. Fuller*, 13 Mich. 119; *Compton v. Blair*, 27 Id. 399; *Lovell v. Willard*, 28 Id. 346; *Todd v. Davis*, 32 Id. 160; *Hubbardston v. Bates*, 31 Id. 164; and such finding can only be reviewed when all the evidence is sent up on an exception that the finding has no evidence to support it: *Gillam v. Boynton*, 36 Mich. 236; *Randall v. Randall*, 37 Mich. 570; *Scotten v. Sutter*, Id. 530.

CHAMPLIN, J. This is an action of replevin for lumber manufactured from logs cut from section 15 in township 29 N., range 8 E., being in the township of Ossineke, in the county of Alpena, Michigan.

The plaintiff's claim to the lumber is based upon his ownership in fee of the land from which the logs out of which it was manufactured were cut. His proof was a patent from the State of Michigan to Oliver Goldsmith; the record of a deed from Goldsmith to Lorenzo M. Mason; the record of a warranty deed from Mason to William Oakes; the record of a warranty deed from Oakes to John Johnston; and a quitclaim deed from Johnston to the plaintiff, dated December 10, 1881, and recorded August 2, 1882.

The defendants also claim title to the logs, and introduced

in evidence a warranty deed from John Johnston to Isaac L. Lyon, of the city of Detroit, Michigan, dated June 1, 1874, but not recorded until November 5, 1882; and also introduced evidence tending to prove that Lyon sold all the timber on section 15 to the firm of L. R. Sanborn & Sons, in the fall of 1878, and the defendants claimed title through this purchase.

The controversy is embraced in very narrow limits. It is between a subsequent purchaser from a common grantor, who has placed his deed upon record, and a person claiming under a prior unrecorded deed. Plaintiff must therefore prevail, unless the defendants have shown that plaintiff either had knowledge or actual notice of the prior unrecorded deed, which is equivalent to, and takes the place of, notice by registration.

The counsel for the defendants requested the court to instruct the jury as follows:

"Under all the testimony in this case, plaintiff had sufficient notice of the rights of the defendants to render his quitclaim deed ineffectual and inoperative"; and, "under all the testimony in this case, your verdict should be for the defendants, and the only question for you to consider is, what was the market value of the lumber taken from defendants, under and by virtue of the plaintiff's writ of replevin?"

The first question proper to be considered, therefore, is whether plaintiff had sufficient notice of defendants' rights as to deprive him of the protection accorded to a subsequent purchaser who is ignorant of a prior unregistered deed.

The bill of exceptions states that it contains, in substance, all of the testimony given on the trial of the cause. Hence, the question is fairly raised upon the record before us, from which it appears that the plaintiff has resided in Alpena county mostly since 1840, and has had experience in looking lands, which was a part of his business, and in buying and selling lands; that he had bought and sold considerable land in the town of Ossineke; that he claimed to hold a tax title on the lands in question, and went and examined the

records of Alpena county to ascertain who owned the original title, and found that the title of record appeared to be in the name of John Johnston; that he immediately commenced efforts to ascertain the whereabouts of Mr. Johnston, and was informed by the postmaster of Port Huron that he resided in Chicago, Illlnois; that on February 1, 1881, he wrote a letter to Johnston, and mailed to him directed to Chicago, to which he received no reply, and wrote again November 7, 1881, and received a reply dated November 28, 1881, in which he stated that these lands were not inventoried in his bankruptcy proceedings, and he had no recollection of selling them to any one, and did not know what the value of the lands was, and wished plaintiff to make him an offer; he thought he could sell them.

Plaintiff then got a letter from Johnston in the spring of 1882, and on May 9, 1882, plaintiff telegraphed Johnston, and went to Chicago, and met him at the Douglass House, June 1, 1882; and at this interview Johnston told him that he had got a discharge in bankruptcy, and if there was anything outside that he had not sold it reverted to him, and he rather depended upon the plaintiff for the record. Plaintiff represented to him that he had a tax title on some of the lands, and there was a large amount of taxes, and the timber had been mostly stripped off of them, and that he could pay him about fifty cents an acre. Plaintiff told him that parties had been stripping the lands for a number of years; they had stripped plaintiff's lands, and had stripped Johnston's with them; that some of the lands had been burned over, and some was good farming land, and some was nearly worthless. At this time plaintiff knew that parties had been generally cutting on those lands.

At this interview plaintiff agreed for the purchase of the land, but the matter was not closed up by payment of the purchase money and delivery of the deed until August 2, 1882. The purchase embraced, and the deed included, in all, about 920.21 acres, and the whole price paid was $460.11.

It appears from the record, and there is no dispute about

the fact, that defendants, under their purchase of the timber from Lyon, growing on this land, cut and took off pine saw-logs in the winter of 1878–79, and again in the winter of 1881–82, when they took off over 100,000 feet. The plaintiff testifies that he never knew before he purchased that defendants had cut and removed pine from these lands, and that he bought the land in good faith, and without any knowledge of the conveyance to Lyon. But we think the facts hereinafter stated, which are undisputed, show conclusively that plaintiff is mistaken upon both of these points.

James L. Sanborn testifies that in the spring of 1882 he had a conversation with the plaintiff about the Lyon timber on section 15, and at that time Oliver claimed to have a tax title, and said nothing about having a deed. In that conversation Oliver asked him from whose lands they were getting this timber off, and he told him from the Lyon lands, and had been bought for L. R. Sanborn & Sons; that these lands were known as the "Lyon lands;" that in another conversation with Oliver, which occurred later, Oliver stated that he did not believe that Lyon had ever bought the land; that he had never recorded the deed; this was some time during the fore part of the summer of 1882 that Oliver told him there was no record of any title to these lands; that Lyon lives at Detroit, and paid taxes while he was lumbering there.

This testimony of James L. Sanborn is not disputed by plaintiff when afterwards recalled to testify, although he does deny a similar statement testified to by William H. Sanborn.

If this were all the testimony bearing upon the question of notice of facts sufficient to put the plaintiff upon inquiry, the plaintiff having denied all notice previous to his purchase, we think the case could not properly have been taken from the jury; but it is not all the testimony bearing upon the fact of notice. The plaintiff's own testimony is as follows, in answer to questions put to him by his attorney :

" *Q.* Now, state exactly what notice you ever had of any deed or conveyance from Mr. Johnston to Mr. Lyon previous to the time of purchasing these lands and paying for them.

*A.* I had nothing, only just a rumor.

*Q.* What was the rumor?

*A.* The conversation with James L. Sanborn was that he had cut some timber on these lands, and I told him I had purchased the lands. He said he understood from Mr. Smith that Mr. Lyon owned the lands. I told him that Mr. Lyon didn't own the lands,—there was nothing on the records."

Here is a definite admission by plaintiff that he had received information from one claiming under the owner of the unrecorded deed that Mr. Lyon owned the land, and surely was sufficient to put a prudent man upon inquiry as to the fact of such ownership by Lyon.

Counsel for plaintiff insists that this conversation occurred after the purchase was completed by payment of the purchase money and receipt of deed. The question directly and explicitly calls for what notice he ever had of any deed or conveyance from Johnston to Lyon before the time of purchasing these lands *and paying for them*. It does not appear that the witness misunderstood the question. On the contrary, the answer is quite consistent with the plaintiff's testimony, in which he says "that he only had one conversation in Chicago; that that is where he made the purchase of these lands;" but that the deed was not sent by him to Chicago until July 13, 1882, and was not received by plaintiff until in August, 1882. The deed has attached the certificate of the clerk of the county court of Cook county, attested on the twelfth day of August, 1882, certifying to the signature and official character of the notary public before whom the acknowledgment appears to have been taken.

There is a singular inconsistency in the dates, which it may be well to call attention to here, appearing upon the deed from Johnston to plaintiff, returned in the record as Exhibit X. The deed appears to have been received for record in Alpena county on the second day of August, 1882, at 9 A. M., while the certificate which the law requires to be attached in order to entitle it to be recorded as a deed executed out of the State of Michigan, bears date August 12,

1882. Now, if this is the true date of the certificate of authentication, then the deed was not entitled to be recorded on the second of August, and, if attached afterwards, a serious question might arise whether the whole deed should not have been again recorded in order to protect the purchaser, and cut off a prior unrecorded deed. But as the point is not raised upon the record, we express no opinion upon it, contenting ourselves with calling attention to what appears upon the face of the printed record before us.

The deed was not transmitted to or received by plaintiff until some time in August, and as an instrument entitling it to record, until after the twelfth of August; for the plaintiff testifies that he received it by mail. The plaintiff does not, in his response to the inquiry, say that he had paid the purchase price at the time he had his conversation with James L. Sanborn. In this connection, it is well to consider another item of testimony given by the plaintiff previously to that quoted above with reference to Lyon's ownership of the land. This question was asked him by his counsel:

" *Q.* State to the jury when you purchased these lands of Mr. Johnston. Did you buy them in good faith?

*A.* In the commencement I had some tax titles of those lands, and I went to look them up. I went to the records, and I heard a rumor that Mr. Lyon owned the land, and I found there was nothing on record."

He found the record title to be in Johnston. Then he went to looking up Johnston, and it was nearly a year before he found out where he was, and it was nearly or quite another year before he got his deed. It does not appear that in the meantime he made any efforts to ascertain whether Lyon had a deed of the land, although told by a party claiming under such deed that his right to cut the pine off the land was based upon Lyon's ownership.

Good faith is not less important than the payment of value, and is not to be determined alone upon the testimony of the party that he acted in good faith; but he must show that from the inception to the conclusion of the transaction he had no notice or knowledge that could affect his conscience,

or render it inequitable for him to make the purchase. And it must be remembered that this plaintiff is not putting forward this claim of being an innocent purchaser in good faith, without notice, as a shield to protect a possession acquired, but as a sword to attack the possession and rights of others. It rests with him, therefore, to disprove every fact and circumstance put in evidence by the defendants from which notice may legitimately be inferred, or which justifies the inference that it was his duty to inquire as to Lyon's ownership. He is chargeable with notice, not only where the evidence raises a presumption that he knew, but where there is just ground for inferring that reasonable diligence would have led him to a discovery of the truth: *Warren v. Swett*, 31 N. H. 332; *Nute v. Nute*, 41 N. H. 60. "One who willfully remains ignorant where the rights of a third person are concerned, is as much in default as if he had the knowledge which he avoids. The question, therefore, is not merely did the 'plaintiff' know, but had he sufficient information to render it his duty to inquire, and would an investigation in the ordinary course of business have led to a discovery of the" title claimed by the opposite party; "or, as the rule is sometimes stated, a purchaser has notice, not only of what is definitely communicated to him, but of all that a proper use of that information would have enabled him to ascertain." See 2 Lead. Cas. Eq. (White & Tudor, 4th Amer. Ed.) pt. 1, pp. 153, 154, and the cases there cited; *Baker v. Bliss*, 39 N. Y. 70; *Converse v. Blumrich*, 14 Mich. 120; *Hosley v. Holmes* 27 Mich. 427; *Stetson v. Cook*, 39 Mich. 754.

We fully concede the doctrine that a party is not bound to notice or investigate mere neighborhood or general rumor, whether true or not (*Butler v. Stevens*, 26 Me. 484; *Larzelere v. Starkweather*, 38 Mich. 107); but this is not a case of vague rumor of the neighborhood, or conversation between strangers to the title, which the plaintiff was neither bound to heed nor trace to its source; but the notice was more than a rumor,—it was information given him by the party claiming under the Lyon deed, to the effect that he (Lyon) was the owner of the land. To say that Oliver was not

obliged to heed this notice of Lyon's ownership, and that no duty was imposed upon Oliver to follow up this information as to the Lyon title, would, to say the least, indicate very loose notions of right and wrong, and of the obligations imposed by what is called "good conscience." But plaintiff made no inquiry whatever in that direction, and, so far as this record shows, there was an utter absence of any effort to ascertain the facts in reference to the Lyon title. We think, as matter of law, upon the testimony of plaintiff and of James L. Sanborn, about which there is no dispute, the plaintiff was chargeable with notice of the unrecorded conveyance to Lyon.

There are other facts in the case which deprive the plaintiff of the protection of a *bona fide* purchaser from Johnston. The plaintiff testifies that Johnston told him that these lands were not inventoried in the bankruptcy proceedings in which he obtained his discharge. Why were they not included? Did plaintiff inquire? No; if he had, he would have ascertained that they were conveyed to Lyon in 1874, and the proceedings in bankruptcy were not had until 1877, which was a sufficient reason why they were not included. He would have also ascertained that if Johnston had any interest whatever in these lands, it had been conveyed to his assignees in bankruptcy.

The petition, the adjudication, and the assignment to the assignees, made in 1877, were put in evidence, and there was no evidence introduced to show that the assignees had been discharged. If, therefore, Johnston had any interest in these lands, it passed to and still remains in his assignees in bankruptcy, and Johnston had absolutely nothing to convey to Oliver, and of this he must be held to have had notice, because he was apprised by Johnston of the bankruptcy proceedings before he purchased. A person cannot be an innocent purchaser of land which his grantor informs him has been already conveyed by him to another person.

The mere fact that Johnston had received his discharge in bankruptcy did not operate to reinvest him with the property transferred to his assignees.

We have not overlooked the fact that the jury, in answer to a question, found that the plaintiff, Oliver, in making the purchase of these lands from Johnston, acted in good faith. In view of the facts disclosed in the record, and the testimony above referred to, it is apparent that the jury did not apply the proper legal standard to test the good faith of the purchase by plaintiff under the facts and circumstances of this case.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.